Indicated will be Kaufman and Goodman against American Express Travel, Appeal No. 16-1691. Good morning, Your Honor. Mr. Greenfield. Richard Greenfield on behalf of the appellants. I think it would be an understatement to say that the district court, by the time of the final approval, was exhausted by this case. It had been around ten years, or less than ten years. It had been the subject of numerous settlement iterations, none of which, by the time of this final settlement hearing, had ever been approved. I think it's important to say that the present settlement before the court, that was ultimately approved by the district court, was infected from the outset by the first settlement that was negotiated between American Express and Plaintiff's Counsel. That settlement came up with a notice program that was not designed to reach very many people. It provided for generous counsel fees before there was any significant work done, before there was any discovery, and provided for a reversion of most of the settlement fund back to American Express. Mr. Greenfield, we're familiar with the long history of the settlement efforts that the district judge did not approve. I've got a number of questions, one of which is, if we were to approve this settlement, affirm the approval, but to reduce the fee awards, where would the money go? There was a provision made for leftover money to go to a Cypre, in this case, the Consumer's Union, which produces consumer reports. Okay, thank you. The reason I started out with the initial settlement, Your Honor, is that the principles that underlay that settlement infected everything that happened thereafter. And the most recent settlement, the one approved by the district court, basically gave American Express everything it ever asked for from the outset. A global release of claims that were mostly not before the court. In fact, the court accepted at face value a representation that the maximum damages to the class were $9.6 million. In fact, Your Honor, we had discovery in the related case which showed the damages to be more than ten times, approximately ten times that. And why was the district judge wrong to go with the lower number, given the record before her? Because the entire emphasis by Plaintiff's Counsel and American Express had been on the so-called split tender transactions. And an argument could be made, and American Express did make it forcefully, that under their theory of damages, the maximum damages could be $9.6 million. But, as Your Honors may want to ask counsel for American Express and counsel for the plaintiffs, that $9.6 million that the court used and accepted was only related to the split tender transactions. It didn't relate. Where does the other $90 million come from under your theory? That came from the total fees that were extracted from class members wrongfully, as a result in part of the split tender transaction. What else? What other damages beyond the $91? No, beyond the $9.6 million. How do you get that up to $90 to $100 million? This was the amount that American Express acknowledges that it charged with a $2 per month charge against customers' accounts. These are total fees assessed for all of the gift cards, whether people were happy or unhappy, right? No. I've been waiting with bated breath for you to tell us how you get a $10 million case up to a $100 million case. The money was taken because of circumstances that existed, in part because of split tender transactions, which made it more difficult for card members to use their cards. Money was left in their accounts when they couldn't use the gift card at places. American Express advertised these cards are good wherever American Express cards are accepted. That was not true. What evidence was before the district judge to show that there was even an arguable claim on the scale that you're talking about? Evidence. We're aware of the problem with the zero balance card claims, which apparently were not supported by evidence. There was no evidence as to the $9.6 million, Your Honor. This was a number that was derived from defendants working back from $91 million. That was not evidence either, but it was presented by American Express, accepted by plaintiffs' counsel, and presented to the court. And the court accepted that. So that was not in the form of evidence either. Mr. Greenfield, I don't know what you want to cover this morning. One of the things I wanted to raise with you is you've suggested that the district judge erred by following the sequence that she did in terms of the notice to class members and the time for filing objections and the time for seeking final approval of the settlement. And you rely a good deal for that argument on this court's decision in Redmond. Yes. And I've got to say, at page 34 of your brief, you purport to quote Redmond, in which you have the wrong volume number, the wrong page number, and you have completely distorted the substance of the quotation. I apologize for that, if it was done, Your Honor. It was extremely misleading and undermines the credibility of a good deal of what you have to say. Please proceed. I have one question, and that's on the credit card itself. Was there a cap on the size of the gift card? Not that I know, Your Honor. I don't know what, $100 or what? No, the typical amount, I believe, was less than $100. When you say typical amount, because that's sort of important, because how big were these things? Oh, they were given as gifts, and they typically were probably, and I say probably, we have no data in the record that shows whether they were $25 gift cards,  or a $1,000 gift card. More unlikely. Okay, well, as also you know, there are a lot of American Express credit cards that some places won't accept because of their high withholding from the retailers. Yeah, well, these shouldn't be confused with American Express credit cards. Shouldn't? They are distinctly different. Okay. Well, I'm sure of that. I'm just not sure about the whole. If I may get back to the whole. The reason I'm curious about the amount, because that's what adds up. And I understand some people just say they had a card they could get $5 for settlement. So this is kind of a weird case for me. You get gift cards from places. You know, I have a friend who helps us out a lot on stuff, you know, $50 gift card, and that's for, you know, Lowe's or something. But that's different than what this is. This is a universal, or whatever it is, acceptable card, I guess, if you turn it in. No, Your Honor is correct. It's the kind of thing that you might use for yourself. Or if you want to give someone a Christmas present, you might give them a $25 or $50 gift card. Graduation, that's right. Graduation gift. If I may get back to the Redmond decision, I don't think even if we have somehow miscited. It's not if. It's very clear. No, I'm saying I accept that admonition, Your Honor. It's all about attorney's fees also. Yes, but Redmond stands for the proposition that in the context of attorney's fees, the notice must essentially give class members an opportunity after papers are filed with the court to object or opt out. Right. They're entitled to object to the fees. Right. Sure. That's required under the text of the rule. Even more important than fees, Your Honor, is the substance of the settlement. And we make the argument, and it's a matter of first impression before this court. In other words, no other court has accepted what you're asking us to do, and it's not in the rule itself. No other court in this circuit. However, the Mercury Interactive case in the Ninth Circuit, which had its origin also in a fee disclosure issue, makes very clear that the better approach is to have the substance of the settlement before class members, before the time that they have to opt out. Sure. Wasn't that done here? Excuse me? Wasn't that done here? No. There was a preliminary approval of the settlement, right? Didn't the notice tell them anything about the terms of the settlement? The terms, but not any of the supposed justifications for it. Nothing. Okay. And further, the notice. So you think the notice needs to spell out point, counterpoint, why it's a good idea, what objections have been raised to the settlement, and so on? No. How much does it have to say? It has to provide, this is not being glib, Your Honor, enough, enough to put a reasonable person on notice. If a person gets the notice and is really curious about it, they can presumably get into the papers submitted in support of preliminary approval, right? They could, but preliminary approval sometimes gets changed. Of course. If objections are considered, you would expect that. Yeah. But you seem to want the notice, the call and response to go on forever. No. With hundreds of thousands of dollars in expense in each round in this case. No. It's very simple, Your Honor. If the notice provided that plaintiff's counsel or the proponents of the settlement would file their briefs, I'm going to say two weeks before the opt-out and exclusion date, there is then a single document for a class member. Then they would have to supplement those briefs after they have an opportunity to see how many people have objected and opted out, right? That's correct. Right. Okay. And that, I think, is the normal course of events in most settlements of which I'm aware. Really? Yes. I know. It doesn't seem to be in the rules. Has the Civil Rules Committee looked into that? No, the rules provide no guidance. Okay. You're in your rebuttal time. How you use the time is up to you. I'll take the rebuttal time. Thank you, Your Honor. Okay. Thank you. Mr. Bach. Good morning, Your Honors. May it please the Court, Philip Bach for plaintiffs Kauffman, Stegich, and the class. Appellees have split their time ten minutes for me and five minutes for American Express' counsel. The district court did not abuse its discretion in approving this settlement or in awarding the fees. Three rounds of notice. Nearly $1.9 million has been claimed by the class members. Does that include both of those fee waiver programs? Yes. So, is it correct, Mr. Bach, that you were willing to settle on terms and you recommended that the court approve a settlement that would have put $41,000 in the class' hands, leaving 99% of the money in other hands with the first proposed final settlement? That was the result of the, yes, that's the result of the first round of notice. And you thought that was a perfectly reasonable settlement? Fairly reasonable and adequate. The dollar amounts offered to the class member, the amount of the funds, those things were fairly reasonable and adequate. And then we did the notice that we thought was going to be appropriate. We'd recommended a variety of newspapers, regional newspapers. The district court said, no, we're going to do one national newspaper. So we did USA Day Day, I think, or Parade Magazine. And then we did direct mail notice to 1.29 million people by postcards. And the claims rate was very low, abysmal. And so the judge did not approve the settlement. And we conducted, we worked with a notice expert. She asked the parties to propose notice experts. She had one of her own in mind. Mr. Greenfield recommended somebody named Todd Hilsey. And then we worked with Todd Hilsey. The court worked with Todd Hilsey to do a new notice plan. And then we sent more notice and got more claims. And then more notice went out after the Redmond issue was raised by a different objector. And that resulted in even more claims. And, in fact, a lot of this claims payment is a result of us arguing and negotiating with American Express not to challenge claims. Don't challenge any of these claims from people who are in prison or wherever. Pay all the claims. It's difficult as a class action lawyer to be an expert in class action notice and to know whether class members will submit claims in response to claim forms. What's the amount of a typical claim? The average to be paid is $9. People actually submitted a claim in single digits? Yeah. Well, the lowest claim was a $5 attestation claim. All you had to say was you just had to say, I had a card. I don't. Get five bucks. Yeah. And so those bring the average down. But like Your Honor was asking, these are gift cards, $25, $50, $100. We're talking about most people can use their gift cards. Some people don't. Some people just don't. They're in their desk drawer in their office, and they never use it, and then it's gone. Do these expire? They didn't expire, but after one year, American Express used to take $2 a month as a monthly service fee until it was gone. And part of our lawsuit resulted in them changing. They stopped doing that before the federal government passed a statute forbidding it, but they stopped it when we sued them and settled with them. And part of this lawsuit resulted in computer investigation and corrections to avoid these split tender things, where somebody would try to use the card that had less than the full balance or to pay for something that was more than the balance of the gift card, and they'd have a problem because the clerk didn't know how to enter it, and some stores don't let you use a card and cash combined, that sort of thing. Then there's some dispute about attorney's fees, how that should be distributed. Well, the judge, yeah, we originally filed a cross appeal, and we withdrew it. The judge had the discretion. The judge decided who contributed what. We negotiated the settlement. We created the settlement. Mr. Greenfield came in and complained. He still doesn't think the case should be settled. He came in and complained, and along the way the judge herself was having problems with the claims rate, so we worked with Amex, we worked with this notice guy to keep getting more notice out. We spent, American Express spent, the class spent more than $2 million on notice. So this thing was noticed, noticed, noticed, and people submitted claims. The practice changed. It stopped. Most people who had American Express gift cards were able to use them and used them. Some people weren't. So the claim was about some of these systematic problems people had using the gift cards. Those have been remedied. Those have been fixed. The money has been paid or will be paid. The judge was frustrated with even the way the attorney's fees were divided up, was that they were more than the, I don't know what you call them, victims got all told. Well, it depends on how this court looks at this, the total benefit, you know, what's going to be included in the fund. You know, Gaskell v. Gordon, the old cases said it's a percentage of the fund made available that include notice. It could include Cypre. Some of that's changed. The Redmond case, the Pearson case. Pearson says that the fees could be up to 50% of the total of fees plus what the class members are going to get. That Sears Roebuck case was a recent opinion from this court, said it could exceed. Here I think we're at like 52%, but, you know, our firm spent 3,000 hours on this case. It's probably safe to say nobody really wants another round. I think that's, well, listen, these people, these cards were from 2002 to 2011. Some of these people have been waiting five years for their claim payment, two to five years, more than 100,000 people. Now they're in somebody's estate. Yeah, well, yeah, I mean our position is the judge approved the settlement. We weren't that happy with how it turned out. They weren't too happy, but a lot of people were involved in this, five different mediators, twice in this court, but Judge Mikva, Judge Ashman, retired Judge Cahill in California. This thing was litigated, mediated, and noticed to death, and it's time for this thing to be put to bed, frankly. Thank you, Your Honor. Thank you, Mr. Brock. Mr. Bernard. Good morning, Your Honors. May it please the Court. James Bernard on behalf of the Defendant American Express. I wanted to address two things that the Court raised in questioning with Intervenors' Counsel. First, regarding the evidence that was before the Court with respect to the $9 million estimate that the Court determined. Your Honor, there actually was evidence before the Court concerning that. In the supplemental appendix at page 36 is the district court's decision where the district court judge discussed the $91 million and then eventually got to the $9.6 million number. The district court judge cites the Paulson Affidavit, which was an affidavit that was submitted by the parties to explain how we got from the $91 million to the $9.6 million. There was, in fact, therefore, evidence before the Court regarding that calculation, and in fact, Your Honor, as part of the discovery process that ultimately happened here, Mr. Paulson was deposed by class counsel. Intervenors' Counsel was invited to participate in the deposition, did not appear in the deposition, and actually the transcript of Mr. Paulson's deposition was provided to the district court, as was all of the confirmatory discovery that was provided to the district court, in an affidavit that was submitted by Mr. Ryan, that's at docket number 374, and the Court will see in his declaration references to all of the various exhibits, including Mr. Paulson's affidavit. I think the other key point, Your Honor, with respect to the $9 million is the following. Even assuming, and I'm hesitant to use the word, that it was error to say that the number was $9 million, as opposed to some other number, I submit it was harmless error, and the reason is because the class notice, the notice that the class received, went to every single gift card holder, not just gift card holders who had a split tender transaction problem, but all gift card holders, and it went to them three times, and after the third round of notice, we know that the total amount that will be paid to the class is less than the amount in the settlement fund, which is why there will be a SIPRE distribution. When you say gift card holder, are those people that spend it? Yes, Your Honor, these are gift card holders who at one point had gift cards, and for whatever reason didn't exhaust the available balance on their gift card. Okay, so people who used it and had a $50 gift card and got $50 worth of whatever, they aren't in this. Well, that's correct, Your Honor. Somebody who had a $50 gift card, exhausted the $50 gift card, did not suffer any injury, and unless they lied in responding to the elements on the claim form, there should be no reason for them to have suffered harm and have a claim. Okay, but they didn't get a notice. No, actually, that was the point, Your Honor. It went to all gift card holders. Okay, that's what I just asked. Even the people who spent their money got a notice. That's correct. I mean, those people, Your Honor, and just to be clear, the notice worked by publication, and it also worked based on people who had registered their gift cards and provided that information to American Express, and it went to everybody. The other point, Your Honor, that I wanted to address just quickly, because Your Honor mentioned with respect to the Redmond notice issue, even if the court were inclined in this case to alter the Holdman and Redmond to apply to final fairness papers, Your Honor mentioned the papers that were submitted in preliminary approval. It actually goes even beyond that, Judge, because in this case, of course, by the time we got to the final round of final approval, there had been two prior rounds of final approval, and actually, Judge, in preparation for the oral argument, I went and we took a look at the docket, at all of the things in the docket that existed after preliminary approval and before final approval the third time, and if I may just read them into the record, but the class could have found on the docket, in connection with the first round of final approval, material at docket entries 356, 364, through 367, 372, and 376, and then in connection with the second round of final fairness approval, the class could have found information at docket entries 504, 509, 515, 517, and 529. So even if the court were inclined to extend Redmond to final fairness hearing papers, in this case, because we had three rounds, by the time we got to the third round, there were two prior rounds of final fairness approval. Your Honor, this was a fair settlement. It was hotly negotiated, as counsel said, by multiple mediators. The district court judge was diligent and oversaw this case for many years. We believe it's time for it to be approved. Thank you very much. Thank you very much, Mr. Bernard. How much time left for rebuttal? Okay, take two minutes. Mr. Greenfield. Mr. Bernard focused on the $9.6 million, and even if it is accepted that that is the net damages due to the split tender transactions, it is only one category of the many damages that are laid out in the Kauffman complaint and which are being released by the settlement. There are any number of claims that are being dismissed for which class members receive nothing. The notice did not say anything whatsoever about, you may be a member of this class, but unless you did A, B, and C, you will not get anything from this settlement. I think the defendants, as the proponents of the settlement, had a duty to put in the notice a statement to that effect at a minimum. Your Honor raised the question, do you put chapter and verse in the notice? The answer is no. But a class member, to go back to the Redmond issue, should not have to go back through 20 documents filed of record to see what the proponents say in favor of the settlement. There should be one single document filed a couple of weeks prior to the opt-out and exclusion date. It's not very hard to do. It's mostly the same brief that they filed, in this case, a month after the opt-out date. And as Your Honor recognized, they can supplement the record if there are any objections and address those objections. Much was made of the fact that there were multiple mediators in the case. Mediators, however good they may be, only function well if there is advocacy on both sides. There's little doubt that American Express was an advocate. The question is whether Plaintiff's Counsel was ever an effective advocate, as measured by the results obtained. Thank you. Thank you very much, Mr. Greenfield. The case will be taken under advisement.